UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

TREMAIN VERNON JONES,

                Plaintiff,

v.

TRINITY FOOD SERVICE GROUP et al.,

                Defendants.

_____/

Case No. 2:18-cv-74

Honorable Robert J. Jonker

## <u>OPINION</u>

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Trinity Food Service Group, the Michigan Office of Administrative Hearings and Rules, the MDOC, Corizon Medical Health Care, Inc., Horton, Thompson, Isard, Bennett, Hazen, Marra, Clegg, LaCrosse, Stain, Butler, Lamb, O'Brien, Newton, Covert, Batho, Henderson, Bricco, Russell, Sanderson, Gugin, Bigger, and Eicher.

**Discussion**

I.    Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan. The events about which he complains occurred at that facility.  Plaintiff sues Trinity Food Service Group, the Michigan Office of Administrative Hearings and Rules, the Michigan Department of Corrections, Corizon Medical Health Care Services, Inc., Bienvenido Canlas, Connie Horton, Amy MacDowell, K. Garlinghouse, S. Thompson, D. Isard, Peter Hubbard, R. Bennett, C. Hazen, N. Marra, C. Clegg, Michael LaCrosse, Beth Stain, E. Ormsbee, Brad Butler, Patricia Lamb, Sheila E. O'Brien, C. Newton, Robert R. Hansen, E. DeWitt, Gerald Coverty, J. Carruth, R. Batho, W. Henderson, P. Landreville, K. Chancey, M. LaPonsie, D. Bricco, D. Riesener, Richard D. Russell, A. Sanderson, G. Gugin, K. Bigger, T. Eicher, N. Gronda, J. Simpson, and A. Taylor.

In his complaint, Plaintiff alleges that he is a prisoner who has been diagnosed with epilepsy, arthritis, carpel tunnel syndrome, diabetes, and hypertension.  Plaintiff was transferred from the Baraga Maximum Correctional Facility (AMF) to URF on June 12, 2017, and was seen by the Security Classification Committee (SCC) shortly after his arrival.  The next day, Plaintiff was instructed to go to the school building and get his property.  Plaintiff states that Defendant Hansen was inspecting his property and came across Plaintiff's food items, which had been purchased at AMF.  Defendant Hansen refused to allow Plaintiff to take his food items, stating that he was going to give the items to his co-worker.  Plaintiff protested and Defendant Hansen responded by stating, "So listen Jones, you're not leaving here with all of your property, so you might as well give me those items and I'll only confiscate your beard trimmers.  None of you people leave my property room with all of your property."  (Compl., EFC No. 1, PageID.24.)

2

When Plaintiff continued to protest, Defendant Hansen stated that Plaintiff was not going to get any of his property. Defendant Hansen ordered Plaintiff to return to his housing unit.

Plaintiff continued to stand frozen while Defendant Hansen went through his property. At some point, Defendant Hansen discovered legal documents regarding suits Plaintiff had filed against the warden at another prison. Defendant Hansen stated, "Oh shit Jones, don't tell me you're a legal writer, cause I cannot stand you f****rs! Nope, you won't be filing lawsuits here at URF against staff here with this typewriter. Yeah, you might as well go on back to your unit cause you definitely ain't got nothing coming now." (*Id.*, PageID.25.) When Plaintiff attempted to leave, his way was blocked by six large prison guards. Defendant Hansen continued to confiscate Plaintiff's property despite Plaintiff's statement that he had receipts for everything. Defendant Hansen told Plaintiff that his property now belonged to Defendant Hansen, and that there was nothing that Plaintiff could do about it.

Plaintiff later complained to Defendants LaCrosse and Henderson, who told Plaintiff:

> Well, yeah, here at URF, that's what Hansen does, he takes property from you guys and he's pretty thorough with how he takes property from prisoners. Most likely you're gonna have a hearing for anything that he took from you. Not that you're gonna get any of it back, but you will have a hearing in accordance with policy.

(*Id.*, PageID.26.) Plaintiff filed a complaint with the Michigan Attorney General and sent an email to Attorney Daniel Manville, who is the Director of the Michigan State University College of Law Civil Rights Law Clinic. Attorney Manville responded to the email and asked Plaintiff to provide him with the names and prisoner ID numbers of other prisoners that had similar incidents with Defendant Hansen.

On June 22, 2017, after Defendant Hansen found out that Plaintiff had filed a grievance on him, he wrote four false tickets on Plaintiff regarding the seized property. On June

26, 2017, Defendant Durant asked Plaintiff if he wanted to provide a statement with regard to one of the misconduct tickets. Plaintiff told Defendant Durant that he had a problem with stuttering and that he had already written his statement out. Defendant Durant grabbed Plaintiff's legal folder and saw that Plaintiff had a letter from Attorney Manville. Defendant Durant asked Plaintiff about the letter. Defendant Durant then phoned Attorney Manville and asked why he was representing Plaintiff over a typewriter. Attorney Manville did not respond and hung up on Defendant Durant. Defendant Durant then stated to Plaintiff:

> In all of my years working for the department, never, ever, had I seen a prisoner retain an attorney over a ticket. Are you as slow as you are stupid son? Do you know where you're at? Whatever Hansen wrote on you, you're gonna be found guilty, it's just that simple. But what I am required to do is ensure that this person is a real attorney because you people have got 24 hours a day to figure out how to get over on staff and now I have to tell the hearing officer this information.

(*Id*,. 1, PageID.29.) Defendant Durant then began writing notes on the letter from Attorney Manville and told Plaintiff to return to his housing unit. Plaintiff complied and wrote a grievance on Defendant Durant.

A few days later, Defendant Hubbard told Plaintiff that his grievance on Defendant Durant was being denied and that Defendant Durant could do whatever he wanted because Plaintiff was a criminal. Defendant Durant also said that if Plaintiff wrote another grievance on staff, criminal charges would be filed against him. Plaintiff asked Defendant Durant to look at his exhibits, which proved that he lawfully possessed his items. Defendant Durant took Plaintiff's witness statement requests, but not before he made fun of Plaintiff's stuttering.

On July 2, 2017, Plaintiff asked Defendants Horton and Isard for assistance in getting his property returned; they told him to talk to Defendant Hubbard. Defendant Hubbard told Plaintiff that he had better things to do than respond to Plaintiff's letter regarding the confiscated property. Sometime in July, Plaintiff was called to the annex to speak to Defendant

Bigger about a grievance he had filed. Defendant Bigger stated, "Jones, you're such a goof, why didn't you just give Hansen the food and we wouldn't even be here right now, would we, huh?" Defendant Bigger denied the grievance at step I.

On July 5, 2017, Plaintiff had a hearing on one of his misconduct tickets with Defendant O'Brien, who berated Plaintiff for contacting an attorney and told him that he had "nothing coming." Plaintiff begged Defendant O'Brien to look at a previous hearing record, which showed that he lawfully possessed the confiscated typewriter. Defendant O'Brien verbally attacked Plaintiff for contacting an attorney, told him he was stupid, and ordered that his property be destroyed. Plaintiff was sentenced to 30 days' toplock.

Approximately one week later, Defendant McCollum spoke with Plaintiff about the grievance he filed on Defendant Durant. Defendant McCollum told Plaintiff that Defendant Durant had done nothing wrong in calling Plaintiff's attorney. Defendant McCollum stated:

> The mere fact that it appears that you've retained an attorney for a ticket is mind blowing. Here at this facility, Hansen takes property from you guys every single day, and not one of those prisoners went out and hired an attorney to represent them at their administrative hearing. I am gonna deny your [administrative grievance] Jones as I don't find any wrong doing on the part of staff. What you should have done instead of hiring an attorney over this bullshit typewriter incident, maybe you should have hired him to get you a speech therapist or some type of speech specialist because you're retarded, slow and stupid as hell if you ask me.

(ECF No. 1, PageID.32.) Plaintiff appealed the decision and order of Defendant O'Brien to Defendant Russell. Defendant Russell denied Plaintiff's appeal, stating that the hearing was in accordance with prison rules and policy.

On October 23, 2017, Plaintiff submitted a medical kite complaining of suffering from diarrhea, vomiting, nausea, cramping, pain, discomfort, and migraine headaches for a period of three and a half weeks. On October 27, 2017, Defendant Covert called Plaintiff to health care

where he was examined and received Imodium and adult diapers. Plaintiff was placed on the list to see the doctor.

On December 4, 2017, Plaintiff was examined by Defendant Canlas, who told Plaintiff that he would have to undergo testing to determine what was causing his symptoms. Approximately one week later, Plaintiff provided Defendant Covert with urine, blood, and fecal specimens. As a result of the lab tests, Defendant Canlas diagnosed Plaintiff as having "B.C." and salmonella from eating contaminated food. Defendant Canlas asked Plaintiff if he was allergic to any medications, and Plaintiff stated that he was allergic to Penicillin, Sulfa, and Cleocin. Defendant Canlas prescribed Plaintiff a 10 day course of Clindamycin, stating:

> Listen, I'm gonna need for you to take the medication that I'm prescribing you for only 10 days, you should be fine, and should not have any complications or nothing from that short of a period of time. Besides, most of the B.C. and Sal have already left your system right now. I am just making sure that all of the parasites are gone, and that you're healthy again, alright!

(ECF No. 1, PageID.34.)

Following his appointment with Defendant Canlas, Plaintiff went to the chow hall and told Defendant Sanderson that he had contracted parasitic illnesses from the food. Plaintiff asked Defendant Sanderson to look into the food storage practices. Defendant Sanderson appeared to be completely disinterested and said that no one else had complained about the food, but that she would pass his concerns on to her supervisor, Defendant Gugin. Plaintiff filed a grievance on Defendant Sanderson.

On December 12, 2017, Plaintiff woke up with itching over his entire body. Plaintiff asked Defendant Riesener for a health care kite, but Defendant Riesener was busy eating and told Plaintiff that he would put kites out in the tray later. Later in the shift, Plaintiff again requested a kite and Defendant Riesener said he would put some out before he went home for the day. Defendant Riesener did not put any kites in the tray prior to the end of his shift, so Plaintiff

asked second shift officers Landreville and Carruth to send him to health care, but they refused. Defendant Newton observed the exchange, but did nothing to help Plaintiff.

At the beginning of third shift, Plaintiff asked Defendant LaPonsie to send him to health care and showed him that he was covered with hives. Defendant LaPonsie told Plaintiff to return to his cell because there was only one nurse working third shift and she was not going to come see Plaintiff for a rash. Defendant LaPonsie repeatedly told Plaintiff to return in ten minutes and he would call "Amy" [MacDowell] for him. By 11:30 pm, Plaintiff realized that Defendant LaPonsie was not going to call Defendant Amy [MacDowell] for him, so he asked Defendant DeWitt to call Defendant Amy [MacDowell] for him. Defendant DeWitt ignored Plaintiff, so Plaintiff decided to go to the URF West Clinic himself. When he put on his jacket, Defendant LaPonsie asked Plaintiff where he was going and Plaintiff stated that he was going to the clinic. Defendant LaPonsie then phoned Defendant MacDowell and handed Plaintiff the phone receiver. Defendant MacDowell refused to see Plaintiff that night, but stated that she would schedule him to be seen in the morning. Plaintiff begged Defendant MacDowell to see him, stating that he could not breathe. Defendant MacDowell said she would schedule him to see Defendant Canlas and hung up the phone.

Plaintiff disregarded the orders to return to his cell and went to the URF West Clinic. Once inside, Defendant McDonald told Plaintiff that he could have been shot by the perimeter vehicle officers and could be given a ticket. Plaintiff told Defendant McDonald that he could not breathe and needed immediate assistance. Seconds later, Defendant MacDowell arrived. Defendant MacDowell initially told Plaintiff that he seemed ok, but when he showed her his hives, she became serious. Defendant MacDowell took Plaintiff's information and phoned the hospital. Plaintiff heard Defendant MacDowell tell the hospital that Plaintiff was having an allergic reaction

to the Clindamycin, that he was covered in hives, and that his airway was completely restricted. The hospital instructed her to have Plaintiff taken to the hospital immediately. Plaintiff then lost consciousness.

Plaintiff awoke in the hospital and was told that if he had not gotten medical assistance when he did, he would not be alive. Plaintiff was given high doses of steroids and antihistamines. On December 13, 2017, Plaintiff was seen at the URF West Clinic at the prison, where C Corpe, R.N., gave him oral Benadryl and Prednisone to be taken daily until gone. Plaintiff filed a grievance over the delay in treatment for his allergic reaction. Later that morning, Plaintiff spoke with Defendant Newton about his fear that he would be retaliated against because of the grievance. Defendant Newton told Plaintiff that he was going to have to talk to Defendants Ormsbee, Hazen, Henderson, Bigger, Bennett, Marra, Thompson, Isard, Hubbard, and maybe even Horton. Defendant Newton stated that he did not believe that staff would retaliate against him because Plaintiff had a legitimate issue that needed to be addressed.

At the beginning of second shift, Plaintiff entered his housing unit and was stopped by Defendant Landreville, who asked Plaintiff why he had gone to the hospital. Plaintiff told him that he had an allergic reaction and almost died as a result of the indifference of Defendants Landreville, Carruth, LaPonsie, and DeWitt. Defendant Landreville stated:

> Yeah, that sounds pretty fucked up Jones that shit happened to you, but you people tell us lies in here each and every day, how in the hell are we supposed to know when one of ya is really in bad shape. I'm not a doctor, I don't know what to do for you in that sense. My job simply is to enforce the rules, and if one of these bastards starts stabbing the shit outta you, to pull out my tazer and taze his ass hopefully before he kills you and that's it, nothing more. I don't care about none of you people and whatever you've got going on with your medical shit is solely between you and medical, not me. You got it? Walk away from my desk now.

(ECF No. 1, PageID.40.) Defendant Clegg observed the exchange and said nothing.

Plaintiff subsequently complained about staff retaliation to Defendant Ormsbee, who told Plaintiff that he could not request protection from staff. Defendant Ormsbee threatened Plaintiff with a false misconduct ticket and Plaintiff returned to his cell. Plaintiff alleges that unbeknownst to him at the time, Defendant Ormsbee ordered Defendant Chancey to teach him a lesson about filing grievances on staff. Defendant Chancey conducted a retaliatory shake down of Plaintiff's cell, destroying pictures and legal papers belonging to Plaintiff. Defendant Chancey also took one of Plaintiff's albums and opened it to pages showing pictures of Plaintiff's daughter and cousins. Defendant Chancey then placed the open album on the bunk of a prisoner who had been convicted of raping his own children.

Approximately ten minutes later, Defendant Chancey and six other prison guards handcuffed Plaintiff and took him to segregation. Plaintiff was placed in a shower stall and was subjected to a full body cavity search. Plaintiff was ordered to provide a urine specimen within one hour. Plaintiff passed the urine test and was left in the shower stall for the next hour. At this point, Defendant Ormsbee came to review Plaintiff on ten false misconduct tickets written by Defendant Chancey for substance abuse and possession of dangerous contraband. When Defendant Ormsbee asked Plaintiff how he wanted to plead, Plaintiff asked for his attorney. Plaintiff refused to sign the tickets. When Defendant Ormsbee was leaving, he told Plaintiff that he had better get comfortable in segregation because he was sure that the inspector, Defendant Hubbard, would be working closely with the Michigan State Police to seek felony charges against Plaintiff. Defendant Ormsbee then asked Plaintiff if he still thought that filing grievances had been worth it.

The next morning, at approximately 3:39 a.m., Plaintiff was awakened by a segregation officer, who told him that all the tickets against him had been pulled and that he was

being released from segregation. Plaintiff was subsequently returned to his housing unit. Later that morning, prisoner Darius told Plaintiff that when Defendant Hansen confiscated Plaintiff's typewriter, he took parts off it and gave them to prisoner Darius to repair his typewriter. Prisoner Ronald then told Plaintiff that Defendant Hansen was being sued in federal court for taking property from other prisoners in the same manner that he had taken Plaintiff's property.

When Plaintiff was interviewed on his grievance against Defendant Hansen, Defendant Bigger told Plaintiff that he should have taken the deal offered by Defendant Hansen and that nobody hires an attorney over a simple ticket. Plaintiff told Defendant Bigger that Defendant Hansen was already being sued for the same conduct by another prisoner, and told Defendant Bigger the citation of the case. Defendant Bigger ordered Plaintiff to leave the annex.

On December 15, 2017, Defendant Thompson called Plaintiff into his office and asked him what was going on. Plaintiff told Defendant Thompson about his situation. Defendant Thompson called Defendant Riesener to verify whether Plaintiff had asked him for a medical kite on December 12, 2017. Defendant Riesener admitted that Plaintiff had asked for a kite and that he had not given him one because they had run out. Defendant Riesener complained that the prisoners use the kites for burrito wraps. Defendant Thompson instructed Defendant Riesener to go get some kites from the neighboring unit and put them out, stating that there should always be kites available. Defendant Thompson then called Defendant Newton to find out what time Plaintiff had spoken with Defendants Carruth and Landreville. Defendant Newton admitted hearing Defendants Carruth and Landreville refuse Plaintiff's request to go to health care. Defendant Newton stated that Defendant Landreville had told Plaintiff to go to his housing unit and lie down, and that Plaintiff had complied. Defendant Newton also stated that Plaintiff had asked for protection from Defendants Carruth and Landreville because he feared retaliation for filing a

grievance. After ending the phone call with Defendant Newton, Defendant Thompson told Plaintiff that it was obvious staff had failed to act appropriately when they refused to let him go to health care or to call the nurse with Plaintiff's symptoms. Defendant Thompson stated that he would get to the bottom of the situation and told Plaintiff to return to his housing unit.

Upon entering Delta unit, Defendant Carruth threatened Plaintiff with retaliation for complaining about him to his supervisor. As Plaintiff walked by, Defendant Carruth was watching video footage from December 12, 2017, and told his partner Roliston that Plaintiff had "to go tonight." (*Id.*, PageId.50.) Defendant Carruth complained about Plaintiff to Defendant Newton, who stated that what happened next was up to the inspector and the wardens. Defendant Carruth subsequently went to prison gang members Shelton, Copes, Walker, and Samuel Jones and threatened them with disciplinary action and loss of property if they did not get Plaintiff "in line." (*Id.*, PageId.51.)

On December 16, 2017, Defendant Carruth walked past Plaintiff and stated, "Y'all think I playing?" (*Id.*) Plaintiff went to Defendant Bennett and asked to be placed in segregation for his own protection against Defendants Carruth, Landreville, Garlinghouse, DeWitt, and LaPonsie. Defendant Bennett told Plaintiff that he could not place him in segregation because staff was not going to retaliate against him. Plaintiff also spoke to Defendants Bricco and Clegg, and told them that he feared being set up by Defendants Carruth and Garlinghouse. Defendant Clegg told Plaintiff that neither he nor Bricco was a supervisor and that he did not think that Defendants Carruth and Garlinghouse would do anything because it might cost them their jobs.

Later that evening, Defendant Carruth told Defendant Garlinghouse to "go see [Plaintiff's] cube." (*Id.*, PageId.52.) Defendant Garlinghouse went to Plaintiff's cube and ordered everyone to leave. Then Defendant Garlinghouse completely destroyed the entire cube area for

approximately two and a half hours. When he left, he looked at Plaintiff and stated, "Next time you decide to go and snitch me out to my boss, you'll keep your fucking mouth shut." (*Id*.) At the end of shift, Defendants Carruth and Garlinghouse came to Plaintiff's cube and stated:

> Like I said before, when I get here tomorrow, that fucker Jones had better not be, or we will simply just remain acquainted with this cube for as long as it takes for you guys to get the picture . . . Jones has to go, and I'm leaving it up to you guys to make that happen. I don't give a shit what happens to you guys' property, as I can throw it away each and every day that I want until I'm tired and have had enough. So y'all better choose. Is it gonna be Jones, or do you guys wanna deal with this every single fucking day? Cause if that's what y'all want, we're definitely prepared to accommodate you guys' wishes. That's it, night fellas.

(*Id*.)

At approximately 10:00 pm that evening, Defendant LaPonsie told Plaintiff to report to the annex. Plaintiff was met at the annex by Defendant Hazen, who informed Plaintiff that, based on the number of tickets being written on him, he knew that Plaintiff was being harassed by staff in Delta unit. Defendant Hazen told Plaintiff that he was not going to send him back to Delta and, until the Warden could decide what to do with him, he could either go to segregation or go to the Eastside. When Plaintiff asked if confinement in segregation would increase his security level, Defendant Hazen told him no, but that if staff in segregation ordered him to return to Delta, and he refused, he could be given a ticket, which could result in an increase in his security level. Plaintiff chose to go to URF East Lime Unit.

Before Plaintiff could pack up and move to Lime Unit, he suffered an epileptic seizure and was taken to the hospital for injuries to his head, tongue, shoulder, and hand. While at the hospital, Defendants LaPonsie and DeWitt packed up some of Plaintiff's property and left the rest of it on the floor, telling other prisoners that they could take what they wanted because Plaintiff would not be back. When Plaintiff arrived in Lime Unit, he asked Defendant Taylor if he could call over to Delta Unit for the rest of his property. Defendant Taylor said that he had been

warned about Plaintiff by officers in Delta Unit, and that Plaintiff had "nothing coming" and was "fucked." (*Id.*, PageId.54.) Plaintiff filed grievances regarding his property and the comments by Defendant Taylor.

Plaintiff was interviewed on some of his grievances by Defendants Gugin and Marra, who ultimately denied the grievances. During his interview, Defendant Marra called Plaintiff a liar, told him that he did not know "how to jail," and stated that it was a wonder he hadn't been killed in prison. Plaintiff states that Defendant Marra lied in the grievance response in order to cover up for the misconduct of Defendants LaPonsie and DeWitt.

Defendant Newton interviewed Defendants Carruth and Landreville regarding the refusal to send Plaintiff to health care when he was having an allergic reaction, and they both lied about the events. Defendant Garlinghouse also lied to Defendant Newton when interviewed, claiming that he did not destroy any of Plaintiff's property. Defendants Lamb and Stain responded to Plaintiff's grievance appeal regarding the denial of treatment for his allergic reaction by stating that Plaintiff was agitated and disruptive during the interview and had to be sent back to his housing unit.

In response to Plaintiff's grievance regarding Defendant Chancey, in which he claimed that Defendant Chancey forged misconduct tickets on him, Defendant Chancey stated that he did not know Plaintiff before he conducted the shakedown. Defendant Chancey further stated that he found an ID belonging to Plaintiff's son in a photo album and asked the Sergeant how to proceed. The Sergeant told Defendant Chancey to write a misconduct ticket for forged documents. Defendant Chancey explained that prisoners are not allowed to possess any ID cards other than a copy of their MDOC ID. Defendant Newton found no wrongdoing on the part of Defendant Chancey.

Having heard about the grievances Plaintiff wrote, Defendants Gronda, Eicher, Taylor, and Simpson began to retaliate against Plaintiff. On December 25, 2017, Defendant Gronda wrote three tickets on Plaintiff for standing in his doorway without moving. On December 26, 2017, Defendant Eicher reviewed the tickets with Plaintiff and told him to sign off on them. Plaintiff refused. Defendant Eicher told Plaintiff that if he gave him four bags of chips, he would make the tickets go away. Plaintiff refused. Defendant Eicher then imposed a sanction of nine days on toplock.

On December 28, 2017, Plaintiff told Defendant Butler about the conduct of Defendants Gronda and Eicher. Defendant Butler advised Plaintiff to do his sanctions and stay out of their radar. Plaintiff alleges that Defendant LaCrosse conducted an administrative hearing on an out of place ticket written by Defendants Garlinghouse, and found Plaintiff guilty despite the fact that Plaintiff was asleep at the time of the alleged out of place. Defendant Isard summarily denied Plaintiff's appeal.

On March 1, 2018, Plaintiff asked Defendant Isard if he could be transferred. Defendant Isard told Plaintiff that his family needed to stop calling the prison, because Plaintiff was not going anywhere. Defendant Isard told Plaintiff that he was a target for staff because of those complaints. Defendant Isard stated:

> You're gonna have to go to the West Side, fly under the radar; give me [one] year ticket free cause I don't transfer you guys from the East Side, but once you go to the West Side without being a management problem with my staff you'll be transferred downstate. I'm not going to go back and forth with you about staff when obviously you're the problem here, not staff. Do what you gotta do and stay outta staff's way, and before you know it, your name will come up and I'll get you downstate. But you keep writing all these frivolous grievances and butting heads with staff and you'll be here until your [earliest release date]! It's up to you. I've gotta go now. Good luck Mr. Jones.

(*Id.*, PageID.62-63.)

Plaintiff filed a grievance on Defendant Isard. On March 8, 2018, Defendant LaCrosse interviewed Plaintiff on the grievance and gave him the same advice that Defendant Isard had given. Defendant LaCrosse denied Plaintiff's grievance, stating that there had been no violation of policy. Plaintiff subsequently sent formal complaints to Assistant United States Attorney Barbara L. McQuade, Michigan State Police Captain Michael Krumm, Defendant Horton, and Plaintiff's sister Nicole D. Smith.

On March 20, 2018, Defendant Chancey falsified a ticket on Plaintiff for loitering in the bathroom. On March 21, 2018, Defendant Eicher told Plaintiff that he was not going to beat the ticket and that he should just sign off on it. Defendant Eicher then threatened Plaintiff with additional tickets. Plaintiff was afraid of getting more tickets, so he complied. On March 23, 2018, Defendant Simpson falsified a ticket on Plaintiff for loitering on C wing. On March 24, 2018, Defendant Taylor reviewed that ticket with Plaintiff and told him to sign it. Plaintiff pointed out that he could not have been loitering at that time because he was in the property room and Defendant Taylor had signed Plaintiff's pass. Defendant Taylor acknowledged that Plaintiff was correct, but told Plaintiff to sign off on the ticket anyway. Defendant Taylor imposed a sanction of 2 days on toplock.

Plaintiff claims that Defendants violated his rights under the First, Eighth, and Fourteenth Amendments, as well as his rights under state law. Plaintiff seeks damages, as well as declaratory and injunctive relief.

## II.     Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While

a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Initially, the Court notes that Plaintiff may not maintain a §1983 action against the Michigan Department of Corrections or the Michigan Office of Administrative Hearings and Rules because both of these entities are departments of the State of Michigan. Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1993). Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). In numerous unpublished opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from suit under the Eleventh Amendment. *See*, *e.g.*, *McCoy v. Michigan*, 369 F. App'x 646, 653-54 (6th Cir. 2010); *Turnboe v. Stegall*, No. 00-1182, 2000 WL1679478, at *2 (6th Cir. Nov. 1, 2000). In addition, the State of Michigan (acting through the Michigan Department of Corrections) is not a "person" who may be sued under §1983 for money damages. *See Lapides v. Bd. of Regents*, 535 U.S. 613 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)). Therefore, the Court dismisses the Michigan Department of Corrections and the Michigan Office of Administrative Hearings and Rules.

In addition, Plaintiff's claims against Defendant Trinity Food Service Group fail because the corporation cannot be liable for an individual Defendant's actions based upon a theory of respondeat superior or vicarious liability. A plaintiff bringing an action pursuant to § 1983 cannot premise liability upon a theory of respondeat superior or vicarious liability. *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (*quoting Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). A

plaintiff that sues a private or public corporation for constitutional violations under § 1983 must establish that a policy or custom caused the alleged injury. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998); *Street*, 102 F.3d at 818. The Sixth Circuit has specifically held that like a municipal corporation, a private corporation's "liability must also be premised on some policy that caused a deprivation of [a prisoner's constitutional] rights." *Starcher v. Corr. Med. Sys., Inc.*, 7 Fed. App'x. 459, 465 (6th Cir. 2001). Plaintiff fails to make any allegations showing that Defendant Trinity Food Service Group maintains a custom or policy of serving contaminated food. The mere fact that Defendant Sanderson, an employee of Defendant Trinity Food Service Group, was unresponsive to Plaintiff's complaint about the food is insufficient to show the existence of a policy. Therefore, because Defendant Trinity Food Service Group is not liable under a theory of respondeat superior for Defendant Sanderson's alleged misconduct, it is properly dismissed.

   For the same reason, Plaintiff's claim against Defendant Corizon Medical Health Care Services, Inc. also fails. A private entity which contracts with the state to perform a traditional state function like providing healthcare to inmates—like the Corizon Corporations— can "be sued under § 1983 as one acting 'under color of state law.'" *Hicks v. Frey,* 992 F.2d 1450, 1458 (6th Cir. 1993) (quoting *West v. Atkins,* 487 U.S. 42, 54 (1988)). The requirements for a valid § 1983 claim against a municipality apply equally to private corporations that are deemed state actors for purposes of § 1983. *See Starcher v. Corr. Med. Sys., Inc.,* 7 F. App'x 459, 465 (6th Cir. 2001) (recognizing that the holding in *Monell* has been extended to private corporations); *Street v. Corrections Corp. of Am.,* 102 F.3d 810, 817–18 (6th Cir. 1996) (same); *Rojas v. Alexander's Dept. Store, Inc.,* 924 F.2d 406, 409 (2d Cir. 1990) (same); *Cox v. Jackson,* 579 F.Supp.2d 831, 851–52 (E.D. Mich. 2008) (same). Plaintiff alleges that individual actors denied him appropriate medical care, but does not allege that Defendant Corizon actually violated his

Eighth Amendment rights. Defendant Corizon cannot be vicariously liable for the acts of its employees. Although the Defendant Corizon may be sued for an Eighth Amendment violation under § 1983, Plaintiff has not alleged an official policy or custom, or that any policy or custom was the moving force behind the actions of individual employees. Therefore, the Court will dismiss Plaintiff's claims against Defendant Corizon.

Plaintiff fails to make specific factual allegations against Defendants Horton, Thompson, Isard, Bennett, Marra, Clegg, Stain, Butler, Lamb, Newton, Henderson, Batho, Bricco, Russell, Gugin, and Bigger, other than his claim that they failed to act on his complaints or conduct investigations in response to his grievances. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell*, 436 U.S. at, 691; *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff has failed to allege that Defendants Horton, Thompson, Isard, Bennett, Marra, Clegg, Stain, Butler, Lamb, Newton, Henderson, Batho, Bricco, Russell, Gugin, and Bigger engaged in any active unconstitutional behavior. Accordingly, he fails to state a claim against them.

As noted above, Plaintiff alleges that Defendant Hazen told him that he could tell that Plaintiff was being harassed by staff in Delta unit because of the number of tickets being written on him. Defendant Hazen told Plaintiff that he was not going to send him back to Delta and, until the Warden could decide what to do with him, he could either go to segregation or go to the Eastside. Plaintiff makes no other factual allegations against Defendant Hazen. Because Defendant Hazen's alleged conduct does not constitute a violation of Plaintiff's constitutional rights, Plaintiff's 42 U.S.C. § 1983 claims against Defendant Hazen are properly dismissed.

Plaintiff alleges Defendant Covert saw him on October 27, 2017, and scheduled him for a visit with the doctor. Plaintiff makes no other factual allegations against Defendant Covert. Because Defendant Covert's alleged conduct does not constitute a violation of Plaintiff's constitutional rights, Plaintiff's 42 U.S.C. § 1983 claims against Defendant Covert are properly dismissed.

Plaintiff alleges that Defendant Sanderson appeared disinterested when he told her about his diagnosis and asserted that it was the result of eating prison food. However, Plaintiff also alleges that Defendant Sanderson told him that she would pass his concerns regarding food storage on to her supervisor, Defendant Gugin. Plaintiff fails to allege any facts showing that Defendant Sanderson engaged in any wrongful conduct. Therefore, Plaintiff's 42 U.S.C. § 1983 claims against Defendant Sanderson are properly dismissed.

Plaintiff claims that his due process rights were violated by the false misconduct tickets he received and for which he was found guilty. The Court notes that the only allegations Plaintiff makes against Defendants LaCrosse, O'Brien, and Eicher are that they found him guilty of false misconduct tickets. Plaintiff appears to allege a violation of the procedural protections of the Fourteenth Amendment's Due Process Clause. A prisoner's ability to challenge a prison

misconduct conviction depends on whether the convictions implicated any liberty interest. A prisoner does not have a protected liberty interest in prison disciplinary proceedings unless the sanction "will inevitably affect the duration of his sentence" or the resulting restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin v. Conner*, 515 U.S. 472, 486-87 (1995). Under Michigan Department of Corrections Policy Directive 03.03.105, ¶ B, a Class I misconduct is a "major" misconduct and Class II and III misconducts are "minor" misconducts. The policy further provides that prisoners are deprived of good time or disciplinary credits only when they are found guilty of a Class I misconduct. (*See* Policy Directive 03.03.105, ¶ AAAA). The Sixth Circuit routinely has held that misconduct convictions that do not result in the loss of good time are not atypical and significant deprivations and therefore do not implicate due process. *See, e.g., Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003); *Green v. Waldren*, No. 99-1561, 2000 WL 876765, at *2 (6th Cir. June 23, 2000); *Staffney v. Allen*, No. 98-1880, 1999 WL 617967, at *2 (6th Cir. Aug. 12, 1999).

Plaintiff fails to state whether the misconduct tickets were major or minor misconducts. However, even if Plaintiff was convicted of Class I major misconducts, he fails to state a due process claim. In the seminal case in this area, *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Court prescribed certain minimal procedural safeguards that prison officials must follow before depriving a prisoner of good-time credits on account of alleged misbehavior. The *Wolff* Court did not create a free-floating right to process that attaches to all prison disciplinary proceedings; rather the right to process arises only when the prisoner faces a loss of liberty, in the form of a longer prison sentence caused by forfeiture of good-time credits:

> It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison. But here the State itself has not only provided

21

a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior. Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest." But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

*Wolff*, 418 U.S. at 557 (citations omitted).

The Sixth Circuit has examined Michigan statutory law, as it relates to the creation and forfeiture of disciplinary credits[1] for prisoners convicted for crimes occurring after April 1, 1987. In *Thomas v. Eby*, 481 F.3d 434 (6th Cir. 2007), the court determined that loss of disciplinary credits does not necessarily affect the duration of a prisoner's sentence. Rather, it merely affects parole eligibility, which remains discretionary with the parole board. 481 F.3d at 440. Building on this ruling, in *Nali v. Ekman*, 355 F. App'x 909 (6th Cir. 2009), the court held that under the current iteration of Michigan's good behavior reward scheme, know as disciplinary time,[2] a misconduct citation in the Michigan prison system does not affect a prisoner's constitutionally protected liberty interests, because it does not necessarily affect the length of confinement. 355 F. App'x at 912; *accord, Wilson v. Rapelje*, No. 09-13030, 2010 WL 5491196, at * 4 (E.D. Mich. Nov. 24, 2010) (Report & Recommendation) (holding that "plaintiff's disciplinary hearing and major misconduct sanction does not implicate the Fourteenth Amendment Due Process Clause"), *adopted as judgment of court*, 2011 WL 5491196 (Jan. 4, 2011). In the

---

[1] For crimes committed after April 1, 1987, Michigan prisoners earn "disciplinary credits" under a statute that abolished the former good-time system. Mich. Comp. Laws § 800.33(5).

[2] For some crimes committed after December 15, 1998, and all crimes committed after December 15, 2000, Michigan prisoners are "penalized" with "disciplinary time" under a stature that abolished the disciplinary credit system. Mich. Comp. Laws § 800.34.

absence of a demonstrated liberty interest, Plaintiff has no due-process claim based on the loss of disciplinary credits. *See Bell v. Anderson*, 301 F. App'x 459, 461-62 (6th Cir. 2008).

Even in the absence of a protectible liberty interest, a prisoner may be able to raise a due-process challenge to prison misconduct convictions that result in a significant, atypical deprivation. *See Sandin*, 515 U.S. at 472; *see also Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004) (holding that unless a prison misconduct conviction results in an extension of the duration of a prisoner's sentence or some other atypical hardship, a due-process claim fails). Plaintiff has not identified any significant deprivation arising from his misconduct convictions. Accordingly, he fails to state a viable due process claim with regard to the issuance or handling of his misconduct tickets.

Plaintiff also makes a conclusory assertion that Defendants LaCrosse, O'Brien, and Eicher found him guilty of misconducts in retaliation for his use of the grievance system. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005);

*Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987). "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)); *see also Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003) (in complaints screened pursuant to 28 U.S.C. § 1915A, "[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial") (internal quotations omitted); *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001) ("bare allegations of malice on the defendants' parts are not enough to establish retaliation claims" that will survive § 1915A screening). In some circumstances, temporal proximity "may be 'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.'" *Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004)). However, "[c]onclusory allegations of temporal proximity are not sufficient to show a retaliatory motive." *Skinner v. Bolden*, 89 F. App'x 579, 580 (6th Cir. 2004).

Plaintiff merely alleges the ultimate fact of retaliation. He alleges no facts from which to reasonably infer that the actions of Defendants LaCrosse, O'Brien, and Eicher were motivated by any of his protected conduct. Plaintiff merely concludes that because he filed some grievances within a few days, weeks or months before the actions of Defendants LaCrosse, O'Brien, and Eicher, their actions must have been motivated by his grievances. The Sixth Circuit, however, has been reluctant to find that temporal proximity between the filing of a grievance and an official's adverse conduct, standing alone, is sufficient to establish a retaliation claim. *Hill v. Lappin*, 630 F.3d 468, 476 (6th Cir. 2010). This is especially true where, as here, the plaintiff is a prolific filer of grievances. *Coleman v. Bowerman*, 474 F. App'x 435, 437 (6th Cir. 2012) (holding

that temporal proximity to the filing of a grievance is insufficient because any adverse action "would likely be in 'close temporal proximity' to one of [the plaintiff's] many grievances or grievance interviews"). Plaintiff merely alleges temporal proximity between the conduct of Defendants LaCrosse, O'Brien, and Eicher and his many grievances. Such allegations are insufficient to state a retaliation claim.

Moreover, assuming that Defendants LaCrosse, O'Brien, and Eicher are hearing officers whose duties are set forth at Mich. Comp. Laws § 791.251 through § 791.255, Plaintiff's claims fail for another reason, hearing officers are required to be attorneys and are under the direction and supervision of a special hearing division in the Michigan Department of Corrections. *See* Mich. Comp. Laws § 791.251(e)(6). Their adjudicatory functions are set out in the statute, and their decisions must be in writing and must include findings of facts and, where appropriate, the sanction imposed. *See* Mich. Comp. Laws § 791.252(k). There are provisions for rehearings, *see* Mich. Comp. Laws § 791.254, as well as for judicial review in the Michigan courts. *See* Mich. Comp. Laws § 791.255(2). Accordingly, the Sixth Circuit has held that Michigan hearing officers are professionals in the nature of administrative law judges. *See Shelly v. Johnson*, 849 F.2d 228, 230 (6th Cir. 1988). As such, they are entitled to absolute judicial immunity from inmates' § 1983 suits for actions taken in their capacities as hearing officers. *Id.*; *and see Barber v. Overton*, 496 F.3d 449, 452 (6th Cir. 2007); *Dixon v. Clem*, 492 F.3d 665, 674 (6th Cir. 2007); *cf. Pierson v. Ray*, 386 U.S. 547, 554-55 (1967) (judicial immunity applies to actions under § 1983 to recover for alleged deprivation of civil rights).

Plaintiff also appears to be asserting state law claims against Defendants Trinity Food Service Group, the Michigan Office of Administrative Hearings and Rules, the MDOC, Corizon Medical Health Care, Inc., Horton, Thompson, Isard, Bennett, Hazen, Marra, Clegg,

LaCrosse, Stain, Butler, Lamb, O'Brien, Newton, Covert, Batho, Henderson, Bricco, Russell, Sanderson, Gugin, Bigger, and Eicher. The Court must consider whether to exercise supplemental jurisdiction over such claims. When making this determination, the Court "should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). After considering these factors, the Court finds that they weigh against the exercise of supplemental jurisdiction. Accordingly, Plaintiff's state-law claims against Defendants Trinity Food Service Group, the Michigan Office of Administrative Hearings and Rules, the MDOC, Corizon Medical Health Care, Inc., Horton, Thompson, Isard, Bennett, Hazen, Marra, Clegg, LaCrosse, Stain, Butler, Lamb, O'Brien, Newton, Covert, Batho, Henderson, Bricco, Russell, Sanderson, Gugin, Bigger, and Eicher will be dismissed without prejudice.

The Court concludes that Plaintiff's Eighth Amendment claims against Defendants Canlas, MacDowell, Carruth, Landreville, LaPonsie, and Riesener appear to state a claim and are not properly dismissed on initial review. In addition, Plaintiff's First Amendment retaliation claims against Defendants Garlinghouse, Hubbard, Ormsbee, Hansen, DeWitt, Carruth, Landreville, Chancey, LaPonsie, Riesener, Gronda, Simpson, and Taylor appear to state a claim and may not be dismissed on initial review.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that the claims under 42 U.S.C. § 1983 alleging violations of due process will be dismissed for failure to state a claim. In addition, Plaintiff's 42 U.S.C. § 1983 claims against Defendants Trinity Food Service Group, the Michigan Office of Administrative Hearings and Rules, the MDOC, Corizon Medical Health Care, Inc., Horton, Thompson, Isard, Bennett, Hazen,

Marra, Clegg, LaCrosse, Stain, Butler, Lamb, O'Brien, Newton, Covert, Batho, Henderson, Bricco, Russell, Sanderson, Gugin, Bigger, and Eicher will be dismissed for failure to state a claim under 28 U.S.C. §§ 1915(e) and 1915A, and 42 U.S.C. § 1997e(c). Accordingly, these Defendants will be dismissed because Plaintiff fails to state a claim against them under federal law and the Court declines to exercise supplemental jurisdiction over any claims against them under state law.

An order consistent with this opinion will be entered.


Dated:    January 10, 2019              /s/ Robert J. Jonker
                                         ROBERT J. JONKER
                                         CHIEF UNITED STATES DISTRICT JUDGE