UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TREMAIN VERNON JONES #412981,

        Plaintiff,

    v.

TRINITY FOOD SERVICE GROUP, et al.,

        Defendants.

_____/

Case No.   2:18-cv-00074

Hon.  Robert J. Jonker
U.S. District Judge

## **REPORT AND RECOMMENDATION**

### I.  Introduction

This is a civil rights action brought by state prisoner Tremain Vernon Jones pursuant to 42 U.S.C. § 1983. Jones asserts First and Eighth Amendment claims against the remaining Defendants: Dr. B. Canlas, A. MacDowell, K. Garlinghouse, P. Hubbard, E. Ormsbee, R. R. Hansen, E. DeWitt, J. Carruth, P. Landreville, K. Chancey, M. LaPonsie, D. Riesener, N. Gronda, J. Simpson, and A. Taylor.

This Report and Recommendation will address three pending motions. First, Defendant Canlas has filed a motion for summary judgment asking the Court to dismiss Plaintiff Jones's Eighth Amendment deliberate indifference claim against him. (ECF No. 36.) The undersigned has reviewed the record and concludes that no genuine issue of material fact exists with regard to this claim, which is Jones's only claim against Canlas. Accordingly, the undersigned respectfully recommends that this Court grant Defendant Canlas's motion for summary judgment (ECF No. 36) and dismiss him with prejudice.

Second, Defendants MacDowell, Garlinghouse, Hubbard, Ormsbee, Hansen, DeWitt, Carruth, Landreville, Chancey, LaPonsie, Riesener, Gronda, Simpson, and Taylor (the MDOC Defendants) have filed a motion for severance and dismissal of misjoined claims, or, alternatively, for partial summary judgment due to Jones's failure to exhaust administrative remedies.   (ECF No. 74.) Defendants argue that Jones's civil complaint misjoins unrelated claims and defendants in a single cause of action.   The undersigned agrees and respectfully recommends this Court dismiss all Defendants in this case except Hansen without prejudice, thus allowing Jones to file separate causes of action if he wishes to do so. Hansen acknowledges that Jones exhausted his administrative remedies with regard to Jones's claims against him. Accordingly, this Report and Recommendation will not address the remaining MDOC Defendants' motion for summary judgment based on exhaustion.

Third, Plaintiff Jones has filed a motion for a permanent injunction and a restraining order.   (ECF No. 95.)   I respectfully recommend that the Court deny Jones's motion for injunctive relief.

If this recommendation is accepted, only Jones's retaliation claims against Defendant Hansen will remain.

## II.   Factual Allegations

Jones's civil complaint, which is single-spaced and typewritten, runs some 110 pages in length.   The complaint alleges a host of violations that occurred at Chippewa Correctional Facility (URF) from June 2017 through March 2018.   Jones's allegations fall into two broad categories:   (1) assertions of retaliation against him,

in violation of the First Amendment, and (2) assertions that some of the Defendants were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment.   This report and recommendation summarizes Jones's claims in roughly chronological order.

Plaintiff Jones was transferred from the Baraga Maximum Correctional Facility (AMF) to the Chippewa Correctional Facility (URF) on June 12, 2017.   The next day, Jones was instructed to go to the school building and get his property. Jones states that Defendant Hansen was inspecting his property and came across food items purchased at AMF.   Defendant Hansen refused to allow Jones to take his food items and allegedly was going to give the items to his co-worker.   Jones protested and Defendant Hansen responded by stating, "So listen Jones, you're not leaving here with all of your property, so you might as well give me those items and I'll only confiscate your beard trimmers.   None of you people leave my property room with all of your property."   (EFC No. 1, PageID.24.)   After Jones protested, Defendant Hansen ordered Jones back to his housing unit without his property.

At some point during his inspection, Defendant Hansen discovered legal documents regarding lawsuits Jones had filed against the warden at another prison. Defendant Hansen allegedly stated, "Oh shit Jones, don't tell me you're a legal writer, cause I cannot stand you f****rs!   Nope, you won't be filing lawsuits here at URF against staff here with this typewriter.   Yeah, you might as well go on back to your unit cause you definitely ain't got nothing coming now."   (*Id*., PageID.25.)   Jones says he attempted to leave but his way was blocked by six large prison guards.

3

Defendant Hansen told Jones that his property now belonged to Defendant Hansen, and that there was nothing that Jones could do about it.

Jones alleges that, on June 22, 2017, after Defendant Hansen found out that Jones had filed a grievance on him, Hansen wrote four false tickets against Jones regarding the seized property.

Jones says that, on July 2, 2017, he asked Defendant Hubbard for assistance in getting his property returned.   Defendant Hubbard told Jones that he had better things to do than respond to a letter regarding the confiscated property.

Jones alleges that his Eighth Amendment right to medical care was violated. Jones says that he received inadequate medical care to treat abdominal pain and diarrhea he was experiencing in 2017.   On December 4, 2017, Jones was examined by Defendant Dr. Canlas, who told Jones that he would have to undergo testing to determine what was causing his pain symptoms.   As a result of the lab tests, Defendant Dr. Canlas diagnosed Jones as having "B.C." and salmonella from eating contaminated food.   Defendant Dr. Canlas asked Jones if he was allergic to any medications and Jones stated that he was allergic to Penicillin, Sulfa, and Cleocin. Defendant Dr. Canlas prescribed Jones a 10-day course of Clindamycin, stating:

> Listen, I'm gonna need for you to take the medication that I'm prescribing you for only 10 days, you should be fine, and should not have any complications or nothing from that short of a period of time. Besides, most of the B.C. and Sal have already left your system right now. I am just making sure that all of the parasites are gone, and that you're healthy again, alright!

(ECF No. 1, PageID.34.)

4

On December 12, 2017, Jones woke up with itching over his entire body. Jones asked Defendant Riesener for a health care kite, but Defendant Riesener was busy eating and told Jones that he would put kites out in the tray later.   Later in the shift, Jones again requested a kite and Defendant Riesener said he would put some out before he went home for the day.   Defendant Riesener did not put any kites in the tray prior to the end of his shift, so Jones asked second shift officers Landreville and Carruth to send him to health care.   Jones says they refused.

At the beginning of the next shift – third shift – Jones asked Defendant LaPonsie to send him to health care and showed him that he was covered with hives. Defendant LaPonsie told Jones to return to his cell because there was only one nurse working third shift and she was not going to come see Jones for a rash.   Defendant LaPonsie repeatedly told Jones to return in ten minutes and he would call "Amy" for him.

By 11:30 pm, Jones realized that Defendant LaPonsie was not going to call Defendant Amy MacDowell for him, so he asked Defendant DeWitt to call Defendant MacDowell for him.   Jones says that Defendant DeWitt ignored him, so Jones decided to go to the URF West Clinic himself.   When he put on his jacket, Defendant LaPonsie asked Jones where he was going and Jones stated that he was going to the clinic.   Jones says that Defendant LaPonsie telephoned Defendant MacDowell and handed Jones the receiver.   Defendant MacDowell refused to see Jones that night, stating that she would schedule him to be seen in the morning.   Jones begged Defendant MacDowell to see him, stating that he could not breathe.   Defendant

5

MacDowell allegedly said she would schedule him to see Defendant Dr. Canlas and hung up the phone.

Jones's walked to the health care clinic on his own, disregarding the order to stay in his unit.   Defendant MacDowell examined him and initially told Jones that he seemed ok, but when he showed her his hives, she became serious.   Jones says that Defendant MacDowell took his information and then telephoned "the hospital." Jones says that he heard Defendant MacDowell tell "the hospital" that Jones was having an allergic reaction to the Clindamycin, that he was covered in hives, and that his airway was completely restricted.   Jones claims that "the hospital" instructed her to take Jones to the hospital immediately.   Jones then says that he lost consciousness.

Jones says that he awoke in the hospital and was told that if he had not gotten medical assistance when he did, he would not be alive. Jones was given high doses of steroids and antihistamines.[1]

The next day, December 13, 2017, Jones was seen at the URF West Clinic at the prison, where C Corpe, R.N., gave him oral Benadryl and Prednisone to be taken daily until gone.

At the beginning of second shift, Jones entered his housing unit and was stopped by Defendant Landreville, who asked Jones why he had gone to the hospital. Jones told him that he had an allergic reaction and almost died as a result of the

---

[1]     Jones has not presented any medical records to support his claim that he was taken to the hospital, that his condition was life threatening, or that Defendant MacDowell spoke with someone from the hospital.

indifference of Defendants Landreville, Carruth, LaPonsie, and DeWitt.   Defendant
Landreville stated:

> Yeah, that sounds pretty f****d up Jones that shit happened to you, but
> you people tell us lies in here each and every day, how in the hell are we
> supposed to know when one of ya is really in bad shape. I'm not a doctor,
> I don't know what to do for you in that sense. My job simply is to enforce
> the rules, and if one of these bastards starts stabbing the shit outta you,
> to pull out my tazer and taze his ass hopefully before he kills you and
> that's it, nothing more. I don't care about none of you people and
> whatever you've got going on with your medical shit is solely between
> you and medical, not me.   You got it?   Walk away from my desk now.

(ECF No. 1, PageID.40.)

Jones alleges that he became concerned about staff retaliating against him or
causing him harm.   Jones complained about staff retaliation to Defendant Ormsbee,
who told Jones that he could not request protection from staff.   Jones says that
Defendant Ormsbee threatened him with a false misconduct ticket and he returned
to his cell.   Jones alleges that, unbeknownst to him at the time, Defendant Ormsbee
ordered Defendant Chancey to teach him a lesson about filing grievances on staff.
Jones says that Defendant Chancey conducted a retaliatory shake down of Jones's
cell, destroying pictures and legal papers belonging to Jones.   Defendant Chancey
also took one of Jones's albums and opened it to pages showing pictures of Jones's
daughter and cousins.   Defendant Chancey then placed the open album on the bunk
of a prisoner who had been convicted of raping his own children.

Jones says that, approximately ten minutes later, Defendant Chancey and six
other prison guards handcuffed him and took him to segregation. Jones was placed
in a shower stall and was subjected to a full body cavity search.   Jones was ordered

7

to provide a urine specimen within one hour.   Jones passed the urine test and was left in the shower stall for the next hour.   Jones says that he received ten misconduct tickets from Defendant Chancey for substance abuse and possession of a dangerous weapon.   Jones states that Defendant Ormsbee spoke with Jones to review the misconduct tickets.   When Defendant Ormsbee asked Jones how he wanted to plead, Jones asked for his attorney.   Jones refused to sign the misconduct tickets.   Jones says that as Defendant Ormsbee was leaving, he told Jones that he had better get comfortable in segregation because he was sure that the inspector, Defendant Hubbard, would be working closely with the Michigan State Police to seek felony charges against Jones.   Defendant Ormsbee asked Jones if he still thought that filing grievances had been worth it.

The next morning, at approximately 3:39 a.m., Jones was awakened by a segregation officer, who told him that all the tickets against him had been dismissed and that he was being released from segregation.   Jones was subsequently returned to his housing unit. Later that morning, prisoner Darius told Jones that when Defendant Hansen confiscated Jones's typewriter, he took parts off it and gave them to prisoner Darius to repair his typewriter.   Prisoner Ronald then told Jones that Defendant Hansen was being sued in federal court for taking property from other prisoners in the same manner that he had taken Jones's property.

On December 15, 2017, Jones says that Defendant Riesener admitted that Jones had asked for a kite on December 12, 2017, but was not given one because Defendant Riesener did not have any more to give out.   Jones says that Defendant

8

Riesener was instructed that kites should always be available and to get kites from the neighboring unit if he runs out.   C. Newton was called and stated that Defendants Carruth and Landreville refused Jones's request to go to health care and instead told him to go to his housing unit and lie down.

Upon entering Delta unit, Defendant Carruth threatened Jones with retaliation for complaining about him to his supervisor. As Jones walked by, Defendant Carruth was watching video footage from December 12, 2017, and told his partner Roliston that Jones had "to go tonight." (*Id.*, PageId.50.)   Defendant Carruth subsequently went to prison gang members Shelton, Copes, Walker, and Samuel Jones and threatened them with disciplinary action and loss of property if they did not get Jones "in line." (*Id.*, PageId.51.)

On December 16, 2017, Defendant Carruth walked past Jones and allegedly stated, "Y'all think I playing?" (*Id.*)   Jones requested to be placed in segregation for his own protection against Defendants Carruth, Landreville, Garlinghouse, DeWitt, and LaPonsie.

Jones says that later that evening, he overheard Defendant Carruth tell Defendant Garlinghouse to "go see [Jones's] cube." (*Id.*, PageID.52.)   Defendant Garlinghouse went to Jones's cube and ordered everyone to leave.   Then Defendant Garlinghouse completely destroyed the entire cube area for approximately two and a half hours.   When Garlinghouse left, he looked at Jones and stated, "Next time you decide to go and snitch me out to my boss, you'll keep your f*****g mouth shut." (*Id.*)

At the end of shift, Defendants Carruth and Garlinghouse came to Jones's cube and stated:

> Like I said before, when I get here tomorrow, that f****r Jones had better not be, or we will simply just remain acquainted with this cube for as long as it takes for you guys to get the picture . . . Jones has to go, and I'm leaving it up to you guys to make that happen.  I don't give a shit what happens to you guys' property, as I can throw it away each and every day that I want until I'm tired and have had enough.  So y'all better choose.  Is it gonna be Jones, or do you guys wanna deal with this every single f*****g day?  Cause if that's what y'all want, we're definitely prepared to accommodate you guys' wishes.  That's it, night fellas.

(*Id.*)

At approximately 10:00 p.m. that evening, Defendant LaPonsie told Jones to report to the East Lime Unit.  Before Jones could pack up and move to Lime Unit, he suffered an epileptic seizure and was taken to the hospital for injuries to his head, tongue, shoulder, and hand.  While at the hospital, Defendants LaPonsie and DeWitt packed up some of Jones's property and left the rest of it on the floor, telling other prisoners that they could take what they wanted because Jones would not be back.  When Jones arrived in Lime Unit, he asked Defendant Taylor if he could call over to Delta Unit for the rest of his property.  Defendant Taylor said that he had been warned about Jones by officers in Delta Unit, and that Jones had "nothing coming" and was "f****d." (*Id.*, PageId.54.)  Jones filed grievances regarding his property and the comments by Defendant Taylor.

Jones alleges that Defendants Gronda, Taylor, Simpson, and Garlinghouse retaliated against him due to his grievances.  On March 20, 2018, Defendant Chancey falsified a ticket on Jones for loitering in the bathroom.  On March 23, 2018,

10

Defendant Simpson falsified a ticket on Jones for loitering on C wing.   On March 24, 2018, Defendant Taylor reviewed that ticket with Jones and told him to sign it. Jones pointed out that he could not have been loitering at that time because he was in the property room and Defendant Taylor had signed Jones's pass.   Defendant Taylor acknowledged that Jones was correct, but told Jones to sign off on the ticket anyway.   Defendant Taylor imposed a sanction of 2 days of toplock (confinement to quarters).

### III.   Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

## IV.    Analysis of Eighth Amendment Against Defendant Dr. Canlas

Defendant Dr. Canlas states that he treated Jones in November and December of 2017. Dr. Canlas denies that he had prior knowledge that Jones was allergic to Cleocin (clindamycin). Dr. Canlas moves for summary judgment on the Eighth Amendment claim that he acted with deliberate difference.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899 (6th Cir. 2004). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or

where the prisoner's affliction is seemingly minor or non-obvious," *Id.* at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The subjective component was recently summarized in *Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018). The court of appeals stated the following:

> A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference. Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness." This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.

> A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.

- 13 -

But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it."   A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful.   A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailor, and the physician's job is to treat illness, not punish the prisoner. Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals."   That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some treatment for the inmates' medical needs." But there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have "*consciously* expos[ed] the patient to an *excessive* risk of *739 *serious* harm."

*Id.* 738–39 (6th Cir. 2018) (internal citations omitted).

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment.   *Estelle*, 429 U.S. at 105.   As the Supreme Court explained:

[A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind.   Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.   Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.   In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted).

Differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim.   *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir.

- 14 -

1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering.  *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment."  *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).  He must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miller v. Calhoun Cty.*, 408

F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

Dr. Canlas examined Jones on November 1, 2017.   (ECF No. 36-3, PageID.466.; ECF No. 38, PageID.490-492.)   Jones presented with diarrhea and his medical records indicated that he was allergic to Topamax.   (*Id*.)   Dr. Canlas ordered a stool study, but did not prescribe any medication.   (ECF No. 36-3, PageID.467; ECF No. 38, PageID.491-492.)   On November 16, 2017, Dr. Canlas reviewed the results of the stool study.   (ECF No. 36-3. PageID.467; ECF No. 38, PageID.493.)   On December 4, 2017, Dr. Canlas explained to Jones that he had a bacilius cereus infection and he ordered Cleocin (clindamycin) for ten days.   (ECF No. 36-3, PageID.467; ECF No. 38, PageID.494-497.)   A follow-up appointment was scheduled. (*Id*.)

On December 12, 2017, Jones was examined by Defendant R.N. Amy MacDowell for hives and itching.   (ECF No. 36-3, PageID.467; ECF No. 38, PageID.498-499.)   After contacting the on-call medical provider, Defendant MacDowell ordered Benadryl, Solumedrol, and hydrocortisone cream.   (ECF No. 36-3, PageID.467; ECF No. 38, PageID.500-501.)

On December 13, 2017, R.N. Christi M. Corpe examined Jones and noted that his symptoms had decreased, but he was "still really itchy."   (ECF No. 36-3, PageID.467; ECF No. 38, PageID.502-504.)   R.N. Corpe consulted with Defendant Dr. Canlas, who ordered Benadryl and Prednisone and discontinued the Cleocin.   (*Id*.)   By December 14, 2017, Jones no longer had hives or a rash and his itching was

"completely gone", but he still had diarrhea.   (ECF No. 36-3, PageID.467; ECF No. 38, PageID.505.)

On December 20, 2017, N.P. Brenda L. Buchanan saw Jones for a follow-up visit and noted that Jones was allergic to Cleocin (clindamycin) as well as Topamax. (ECF No. 36-3, at PageID.468; ECF No. 38, PageID.506-508.)   Jones reported that his diarrhea had resolved.   (*Id*.)

Jones's essentially asserts that Dr. Canlas knew – **on December 4, 2017** – that he (Jones) was allergic to Cleocin and prescribed it anyway.   The undersigned finds that Jones has failed to place verifying medical evidence into the record to establish that he was diagnosed as being allergic to Cleocin/clindamycin **prior to December 12, 2017**.   Thus, based on the medical records before the Court, Jones's allegations do not satisfy the objective component of the deliberate indifference test.

The Court notes that Jones says that, on December 4, 2017, he told Dr. Canlas that he was allergic to Cleocin.   (ECF No. 43, PageID.556.)   Jones alleges that Dr. Canlas told him that he would be fine because Dr. Canlas was only prescribing the medication for ten days to resolve his infection and to make sure that he would be healthy again.   (*Id*.)   Jones allegations, if credited, establish the **absence** of a genuine issue of material relating to subjective component of his deliberate indifference claim, i.e., whether Dr. Canlas had "a sufficiently culpable state of mind in denying medical care."   *Brown*, 207 F.3d at 867 (citing *Farmer*, 511 U.S. at 834). As noted in *Rhinehart*, 894 F.3d at 739, Jones has to show that Dr. Canlas consciously exposed him to an excessive risk of serious harm.   The statement Jones attributes to

Dr. Canlas indicates the exact opposite:   that Dr. Canlas **did not** believe a prescription for Cleocin/clindamycin would pose a risk to Jones.   Indeed, none of the information provided by Jones establishes a genuine issue of material fact as Dr. Canlas's state of mind.   At best, Jones could state a medical malpractice claim against Dr. Canlas.   But, as noted above, negligence and deliberate indifference to a serious medical need in violation of the Constitution are not the same.   Jones has not set forth facts establishing a genuine issue of material fact as to the subjective component of his deliberate indifference claim against Dr. Canlas.

In the opinion of the undersigned, Jones has failed to support his Eighth Amendment claim against Defendant Dr. Canlas.

## V.   Misjoinder

Defendants argue that Jones presented unrelated, misjoined claims in his complaint and that severance of the unrelated claims is appropriate.

Federal Rule of Civil Procedure 20(a)(2) permits the joinder of defendants in one action under certain circumstances:

> **(2) Defendants.**   Persons . . .may be joined in one action as defendants if:
> **(A)** any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
> **(B)**   any question of law or fact common to all defendants will arise in this action.

Thus, "[a] buckshot complaint that would be rejected if filed by a free person— say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different

transactions—should be rejected if filed by a prisoner." *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007). In *George,* the court severed unrelated claims:

> "A party asserting a claim to relief as an original claim, counterclaim, cross-claim, or third-party claim, may join, either as independent or as alternate claims, as many claims, legal, equitable, or maritime, as the party has against an opposing party." Thus multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2. Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass that this 50–claim, 24–defendant suit produced but also to ensure that prisoners pay the required filing fees—for the Prison Litigation Reform Act limits to 3 the number of frivolous suits or appeals that any prisoner may file without prepayment of the required fees. 28 U.S.C. § 1915(g). George was trying not only to save money but also to dodge that rule. He hoped that if even 1 of his 50 claims were deemed non-frivolous, he would receive no "strikes" at all, as opposed to the 49 that would result from making 49 frivolous claims in a batch of 50 suits.

*Id.*

Where a plaintiff improperly joins claims and defendants, Federal Rule of Civil Procedure 21 provides that the court may "on just terms" either (1) add or drop parties or (2) sever the claims against the parties. *Kitchen v. Heyns*, 802 F.3d 873, 875 (6th Cir. 2015). "To remedy misjoinder, . . . a court may not simply dismiss a suit altogether." *DirecTV, Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006). "Instead, the court has two remedial options: (1) misjoined parties may be dropped 'on such terms as are just'; or (2) any claims against misjoined parties 'may be severed and proceeded with separately.'" *Id.* (citation omitted). "Because a district court's decision to remedy misjoinder by dropping and dismissing a party, rather than severing the relevant claim, may have important and potentially adverse statute-of-limitations consequences, the discretion delegated to the trial judge to dismiss under Rule 21 is

restricted to what is 'just.'" *Id.* This court has severed unrelated claims in prisoner civil rights actions by dismissing the unrelated claims and parties without prejudice so that the plaintiff can file new causes of action in separate lawsuits. *Alexander v. Fillion*, 2:15-cv-13, (ECF No. 95) (W.D. Mich. October 7, 2015); *Cary v. Robinson*, 13-cv-431, (ECF No. 47) (W. D. Mich. Sept. 23, 2014), *Carney v. Treadeau*, 07-cv-83, (ECF No. 52) (W.D. Mich 2008).

In doing so, the court should be mindful of a party's ability to resubmit dismissed claims in new causes of action. As Judge Neff pointed out in *Crawford v. Prison Health Services*, 1:12-cv-409 (ECF No. 46) (W.D. Mich. 2012):

> At least three judicial circuits have interpreted "on terms as are just" to mean without "gratuitous harm to the parties." *Strandlund v. Hawley*, 532 F. 3d 741, 745 (8th Cir. 2008) (quoting *Elmor v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000)) see also *DirectTV, Inc.*, 467 F.3d at 845. Such gratuitous harm exists if the dismissed parties lose the ability to prosecute an otherwise timely claim, such as where the applicable statute of limitations has lapsed, or the dismissal is with prejudice. *Strandland*, 532 F.3d at 746; *DirectTV*, 467 F.3d at 846-47; *Michaels Building Co.*, 848 F.2d at 682.

*Id.* at 5, PageID. 545.

However, in this case dismissal without prejudice will not cause a timing problem because the statute of limitations for § 1983 claims in Michigan is three years. *Id.* Jones complaint contains misjoined claims. Dismissal of the misjoined claims will not cause a statute of limitation issue because the misjoined claims arose between December of 2017 and March of 2018.

As summarized above, Jones's complaint sets forth a number of allegations. Jones's first claim involves retaliation claims against Defendant Hansen that accrued

in June of 2017.    Jones also asserts Eighth Amendment claims that arose in December of 2017.    These claims are clearly unrelated to his initial retaliation claims against Defendant Hansen.    Jones raises further claims of retaliation against Defendants Carruth, Landreville, Chancey, Gronda, Taylor, Simpson, and Garlinghouse that are unrelated to the initial claims of retaliation against Defendant Hansen.    Michigan law tolls the "limitation period while an earlier action was pending which was later dismissed without prejudice."    *Kalasho v. City of Eastpointe*, 66 App'x 610, 611 (6th Cir. 2003).    Jones has sufficient time to re-file his dismissed claims if he chooses to do so.

Therefore, it is recommended that the court dismiss all of the claims against MDOC Defendants that Jones misjoined to his claim against Defendant Hansen without prejudice.    It is recommended that this court allow that claim to proceed in this action and all other claims and parties should be dismissed.[2]

### VI.    Injunction

Jones requests that the Court order "defendants to perform their preexisting fiduciary duties under the U.S.C.A."    (ECF No. 95.)    Jones claims retaliatory acts and interference with medical treatment.    He names several individuals who have violated his rights, but the only Defendant named is Defendant MacDowell.    (*Id*. at

---

[2]    This report and recommendation will not address the MDOC Defendants' motion for summary judgment on the basis of exhaustion for two reasons.    First, Defendant Hansen does not argue that Jones failed to exhaust his administrative remedies against him.    (*See* ECF No. 75, PageID.699.)    And, second, the MDOC Defendants will be able to raise the exhaustion issue if and when Jones files new lawsuits against the parties who were misjoined to this lawsuit.

PageID.885-886.)   Jones requests immediate medical treatment, a transfer to a facility within the greater metropolitan Detroit area, and a new typewriter.

Preliminary injunctions are "one of the most drastic tools in the arsenal of judicial remedies." *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)). The issuance of preliminary injunctive relief is committed to the discretion of the district court.   *Ne. Ohio Coal. v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000).   In exercising that discretion, a court must consider whether plaintiff has established the following elements: (1) a strong or substantial likelihood of success on the merits; (2) the likelihood of irreparable injury if the preliminary injunction does not issue; (3) the absence of harm to other parties; and (4) the protection of the public interest by issuance of the injunction.   *Id.* These factors are not prerequisites to the grant or denial of injunctive relief, but factors that must be "carefully balanced" by the district court in exercising its equitable powers.   *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *see also Ne. Ohio Coal.*, 467 F.3d at 1009.   Moreover, where a prison inmate seeks an order enjoining state prison officials, the court is required to proceed with the utmost care and must recognize the unique nature of the prison setting.   *Glover v. Johnson*, 855 F.2d 277, 284 (6th Cir. 1988); *Kendrick v. Bland*, 740 F.2d 432, 438 n.3 (6th Cir. 1984).   The party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under

the circumstances.   *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).

Under controlling Sixth Circuit authority, Jones's "initial burden" in demonstrating entitlement to preliminary injunctive relief is a showing of a strong or substantial likelihood of success on the merits of his section 1983 action.   *NAACP v. Mansfield*, 866 F.2d 162, 167 (6th Cir. 1989).   Jones has not made such a showing. A review of the materials of record fails to establish a substantial likelihood of success with respect to Jones's claim that the Defendants have violated his federal rights. Other than Defendant MacDowell, Jones is seeking injunctive relief against individuals who are not Defendants in this case.   The Court does not have jurisdiction over individuals that are not parties to this action. *Zenith Radio Corp., v. Hazeltine Research Inc.*, 395 U.S. 100 (1969).

Moreover, Jones has made no attempt to show a substantial likelihood of success on his underlying claims.   The Court has reviewed Jones's Eighth Amendment claims and has concluded that Jones cannot support a deliberate indifference claim against Dr. Canlas.   In addition, Jones has failed to establish a substantial likelihood of success on his claims that he was delayed medical treatment. The medical record shows that Jones received constitutionally adequate medical care. Further, Jones has failed to show a substantial likelihood of success on his retaliation claims, or to establish that any Defendant damaged his typewriter.

A plaintiff's harm from the denial of a preliminary injunction is irreparable only if it is not fully compensable by monetary damages.   *Overstreet*, 305 F.3d at 578.

- 23 -

Jones has failed to assert factors that establish that he will suffer irreparable harm in the absence of an injunction.

Finally, in the context of a motion impacting on matters of prison administration, the interests of identifiable third parties and the public at large weigh against the granting of an injunction.   Any interference by the federal courts in the administration of state prison matters is necessarily disruptive.   The public welfare therefore militates against the issuance of extraordinary relief in the prison context, absent a sufficient showing of a violation of constitutional rights.   *Glover v. Johnson*, 855 F.2d 277, 286-87 (6th Cir. 1988).   That showing has not been made here.

Further, it is well established that a prisoner has no inherent constitutional right to be housed in a particular institution.   *Olim v. Wakinekona*, 461 U.S. 238 (1983); *Hewitt v. Helms*, 459 U.S. 460, 468 (1983); *Meachum v. Fano*, 427 U.S. 215, 224 (1976).   It is respectfully, recommended that Jones's request for injunctive relief be denied.

## VIII.   Recommendation

The undersigned respectfully recommends that this Court (1) grant Defendant Canlas's motion for summary judgment (ECF No. 36) and dismiss Defendant Canlas with prejudice; (2) grant the motion to sever and dismiss misjoined claims (ECF No. 74), thus dismissing all of the MDOC Defendants except Hansen without prejudice; and (3) deny Jones's request for a permanent injunction and permanent restraining order (ECF No. 95).

If the Court adopts these recommendation, Jones's only remaining claim in this case will be a retaliation claim against Defendant Hansen.

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.   28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).   Failure to file timely objections constitutes a waiver of any further right to appeal.   *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985).


Dated:     December 5, 2019                                    /s/ *Maarten Vermaat*
                                                             MAARTEN VERMAAT
                                                             U.S. MAGISTRATE JUDGE